JS 44   (Rev. 09/19)
# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
THEODORE DILENSCHNEIDER,

## DEFENDANTS
ENERGY EXPLORATION TECHNOLOGIES, INC., d/b/a ENERGYX

**(b)** County of Residence of First Listed Plaintiff   Indiana
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Puerto Rico
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Marini Pietrantoni Muñiz LLC
250 Ponce de Leon Ave, Suite 900, San Juan, PR 00918
Tel. 787-705-2171

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

❏ 1   U.S. Government Plaintiff

❏ 3   Federal Question
        *(U.S. Government Not a Party)*

❏ 2   U.S. Government Defendant

✘ 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                              *and One Box for Defendant)*

|                                                    | PTF | DEF |                                                              | PTF | DEF |
|----------------------------------------------------|-----|-----|--------------------------------------------------------------|-----|-----|
| Citizen of This State                              | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State  | ❏ 4 | ✘ 4 |
| Citizen of Another State                           | ✘ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country            | ❏ 3 | ❏ 3 | Foreign Nation                                               | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|----------|-------|---|--------------------|-----------|----------------|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ❏ 835 Patent - Abbreviated New Drug Application | ❏ 460 Deportation |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | **LABOR** | ❏ 840 Trademark | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ✘ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ❏ 480 Consumer Credit (15 USC 1681 or 1692) |
| ❏ 190 Other Contract | ❏ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 720 Labor/Management Relations | ❏ 861 HIA (1395ff) | ❏ 485 Telephone Consumer Protection Act |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 740 Railway Labor Act | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 196 Franchise | | | ❏ 751 Family and Medical Leave Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| | | | ❏ 790 Other Labor Litigation | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 791 Employee Retirement Income Security Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 895 Freedom of Information Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 896 Arbitration |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | ❏ 950 Constitutionality of State Statutes |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

✘ 1   Original Proceeding

❏ 2   Removed from State Court

❏ 3   Remanded from Appellate Court

❏ 4   Reinstated or Reopened

❏ 5   Transferred from Another District *(specify)*

❏ 6   Multidistrict Litigation - Transfer

❏ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. sec. 1332 (a)(1); 28 U.S.C. sec. 2201

Brief description of cause: Breach of Contract; Breach of Implied Covenant of Good Faith and Fair Dealing;
Violations of 14 L.P.R.A. §§ 3682(b) and 3652 ; Fraud and Fraudulent Misrepresentation; Declaratory Judgment.

## VII. REQUESTED IN COMPLAINT:
❏   CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ✘ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
05/29/2026

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #                AMOUNT                APPLYING IFP                JUDGE                MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.** **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT

## DISTRICT OF PUERTO RICO

## CATEGORY SHEET

**You must accompany your complaint with this Category Sheet, and the Civil Cover Sheet (JS-44).**

Attorney Name (Last, First, MI):    Pietrantoni Manuel A.

USDC-PR Bar Number:    219805

Email Address:    mpietrantoni@mpmlawpr.com

1.    Title (caption) of the Case (provide only the names of the <u>first</u> party on <u>each</u> side):

Plaintiff:    THEODORE DILENSCHNEIDER

Defendant:    ENERGY EXPLORATION TECHNOLOGIES, INC., d/b/a ENERGYX

2.    Indicate the category to which this case belongs:

- [x] Ordinary Civil Case
- [ ] Social Security
- [ ] Banking
- [ ] Injunction

3.    Indicate the title and number of related cases (if any).

N/A

4.    Has a prior action between the same parties and based on the same claim ever been filed before this Court?

- [ ] Yes
- [x] No

5.    Is this case required to be heard and determined by a district court of three judges pursuant to 28 U.S.C. § 2284?

- [ ] Yes
- [x] No

6.    Does this case question the constitutionality of a state statute?  (See, Fed.R.Civ. P. 24)

- [ ] Yes
- [x] No

Date Submitted:    05/29/2026

rev. Dec. 2009

| Print Form | Reset Form |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| THEODORE DILENSCHNEIDER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| ENERGY EXPLORATION | ) |
| TECHNOLOGIES, INC., d/b/a ENERGYX, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT**

Plaintiff Theodore Dilenschneider, by and through his undersigned counsel, brings this action against Defendant Energy Exploration Technologies, Inc. d/b/a EnergyX, and in support thereof alleges as follows:

**INTRODUCTION**

1. This case is about a co-founder who built a company from the ground up only to have it stolen from him. Plaintiff Theodore Dilenschneider is a pioneering chemical engineer who invented the metal-organic framework ("MOF") membrane technology that was the early lifeblood of Defendant Energy Exploration Technologies, Inc. d/b/a "EnergyX." He brought his breakthrough science to the venture, lent his credentials to attract investors and business partners, traveled the world presenting the technology, and helped build EnergyX into a commercial enterprise—all before the company was even incorporated. In return, he was promised meaningful equity, robust anti-dilution protections, and preferred stockholder rights that would reflect his instrumental role as a founder. But Mr. Dilenschneider's co-founder, Teague Egan, pushed him out of the company while Mr. Dilenschneider was experiencing a serious health crisis and EnergyX

1

has since wrongly slashed Mr. Dilenschneider's equity and stripped away his preferred stock rights.

2. Mr. Dilenschneider was the scientific engine of EnergyX at its founding. When Mr. Dilenschneider first met Mr. Egan in the summer of 2018, before EnergyX even existed, Mr. Dilenschneider's MOF-membrane technology—on which the company would be based—was already in an advanced stage of development. Mr. Egan had no scientific training, no technical expertise, and no ability to develop, present, or explain the technology on his own. He needed Mr. Dilenschneider. It was Mr. Dilenschneider who explained how to scale and leverage his technology for commercial purposes to prospective investors and business partners, and who served as the scientific backbone that gave the venture credibility. Mr. Egan himself introduced Mr. Dilenschneider to prospective investors and business partners as the company's "lead engineer." EnergyX thus would not exist without Mr. Dilenschneider.

3. After he founded the company, Mr. Dilenschneider was named its first Chief Science Officer and entered a Restricted Stock Award Agreement and the Special Equity Incentive Plan with EnergyX whereby he received preferred and common stock. Under the Restricted Stock Award Agreement and the Special Equity Incentive Plan, Mr. Dilenschneider's equity has anti-dilution protection. If EnergyX changes its capital structure through any transaction, it must adjust Mr. Dilenschneider's equity to ensure he is not diluted. This right is consistent with Mr. Dilenschneider having been one of the founders and first stockholders of the company. In addition, his preferred stock carried special governance rights, such as fifty-to-one super-voting rights, class consent rights over several categories of significant corporate actions, and dividend preferences over other classes of stock, again befitting his role as a founder.

2

4. Despite Mr. Dilenschneider's many contributions, Mr. Egan leveraged his first opportunity to unceremoniously push Mr. Dilenschneider out of the company. In the fall of 2019, Mr. Dilenschneider suffered a serious mental health crisis requiring voluntary hospitalization. Rather than act out of genuine concern for Mr. Dilenschneider, EnergyX, via Mr. Egan, terminated Mr. Dilenschneider as its Chief Science Officer while he was still incapacitated and hospitalized. Notably, Mr. Egan and EnergyX did not claim Mr. Dilenschneider had failed in any of his obligations to the company (he had not); to the contrary, Mr. Egan praised all that Mr. Dilenschneider had done and said he had been "instrumental" in the company's success. In fact, even after ousting him, EnergyX continued to publicly hold Mr. Dilenschneider out as EnergyX's Chief Science Officer—trading on his name, likeness, and credentials in press releases as late as September 2020—further recognizing his value.

5. Nevertheless, over time, EnergyX launched an assault on Mr. Dilenschneider's equity, diluting Mr. Dilenschneider's stake in violation of his contractual anti-dilution rights and purporting to strip away many of his important rights as a preferred stockholder.

6. At the time of Mr. Dilenschneider's exit as EnergyX's Chief Science Officer, he held 313 shares of the company's A-2 Preferred Stock and 625 shares of its Common Stock—a fact the company documented in real time. This represented 0.938% of EnergyX's fully-diluted, as-converted equity and, consistent with his anti-dilution rights, Mr. Dilenschneider is entitled to maintain that level of ownership. But, through a series of equity transactions, EnergyX issued tens of millions of new shares without adjusting Mr. Dilenschneider's shares accordingly, improperly cutting his equity stake by nearly 40%. As a result of these transactions, Mr. Dilenschneider now holds only 0.572% of EnergyX. EnergyX did not notify Mr. Dilenschneider of these transactions

3

in real time and he only learned of them after finally gaining access to the company's capitalization table years after being pushed out of the company.

7. EnergyX's assault on Mr. Dilenschneider's equity rights did not stop there. In or about April 2021, EnergyX purported to adopt a Third Amended and Restated Certificate of Incorporation that materially and adversely affected Mr. Dilenschneider's Founders-2 Preferred Stock (f/k/a Series A-2 Preferred Stock)—subjecting his stock to a distribution preference for a new class of Series A Preferred Stock, weakening his super-voting rights, and imposing new mandatory conversion conditions. EnergyX did this without ever notifying Mr. Dilenschneider, without providing him with any opportunity to vote as a holder of the affected series of stock, and in direct violation of Puerto Rico's General Corporations Act, all of which renders these acts and the Third Amended and Restated Certificate and all subsequent amendments thereto void.

8. In addition, shortly after purporting to strip away his preferred equity rights, EnergyX and Mr. Egan approached Mr. Dilenschneider and demanded that he convert his Founders-2 Preferred Stock to Common Stock.  In making this demand, EnergyX and Mr. Egan presented Mr. Dilenschneider with documentation that tactically referred to an outdated version of the company's certificate of incorporation that misled Mr. Dilenschneider into believing that the company had not made any changes to its capital structure and corporate governance since Mr. Dilenschneider had been pushed out of the company in November 2019, which EnergyX and Mr. Egan knew to be false.  Mr. Egan and EnergyX also concealed that the company had purported to adopt the Third Amended Certificate—which purported to strip away many of Mr. Dilenschneider's preferred equity rights—and was considering a further amendment to it.  In addition, EnergyX, via Mr. Egan, presented Mr. Dilenschneider with misleading information about the number of shares he owned in the company, which led Mr. Dilenschneider to wrongly believe the stock conversion would

benefit him.  Through these deceptions, EnergyX and Mr. Egan got Mr. Dilenschneider—who was again impaired due to mental illness—to sign a document that purportedly converted his Founders-2 Preferred Stock to Common Stock, but that document is legally void given the dubious circumstances under which it was signed.

9. After Mr. Dilenschneider recently discovered EnergyX's wrongful conduct, he demanded that it restore his equity ownership and preferred equity rights.  In response, EnergyX ignored him and then baselessly threatened him.  Weeks after receiving Mr. Dilenschneider's demand, EnergyX asserted for the first time ever that Mr. Dilenschneider had not vested any equity in EnergyX and was not a stockholder at all.  This assertion is ridiculous—the company itself has recognized him as a stockholder repeatedly for years and lists him as a stockholder in its internal records to this day.  This is little more than a transparent effort by EnergyX to bully Mr. Dilenschneider into abandoning his meritorious claims—conduct that, unfortunately, is consistent with the way the company has treated him for some time.

10. Accordingly, Mr. Dilenschneider was forced to bring this case to restore his equity and governance rights.

## THE PARTIES

11. Plaintiff Theodore Dilenschneider is an individual and resident of the State of Indiana. He is a scientist and entrepreneur with deep expertise in lithium extraction technology, including metal-organic frameworks. He is a co-founder of EnergyX and a stockholder of record in the company.

12. Defendant Energy Exploration Technologies, Inc., doing business as EnergyX, is a corporation organized and existing under the laws of the Commonwealth of Puerto Rico, with its principal place of business at 1654 Calle Tulipán, Suite 100, San Juan, Puerto Rico 00927.

5

EnergyX is engaged in the development and commercialization of lithium extraction and battery technology.

**JURISDICTION AND VENUE**

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff is a citizen of the State of Indiana. Defendant EnergyX is a Puerto Rico corporation with its principal place of business in Puerto Rico.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant EnergyX resides in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims—including EnergyX's corporate decisions, certificate amendments, and wrongful equity actions—occurred in this District.

15. Venue is also proper in this District because EnergyX's operative certificate of incorporation states that "any court of competent jurisdiction in the Commonwealth of Puerto Rico shall be the sole and exclusive forum for any stockholder… to bring… any action asserting a claim against the Corporation… arising pursuant to any provision of the General Corporations Act or this Certificate of Incorporation or Bylaws of the Corporation… or… any action asserting a claim against the Corporation… governed by the internal affairs doctrine."[1]

---

[1] Mr. Dilenschneider's invocation of this provision of the certificate of incorporation is without prejudice to his challenge to the validity of the Third Amended and Restated Certificate and all subsequent amendments thereto.

## FACTUAL ALLEGATIONS

### A.  Mr. Dilenschneider is a Leading Expert in Lithium Extraction Technologies

16. Mr. Dilenschneider is an experienced chemical engineer with particular expertise in the field of metal-organic frameworks ("MOFs"), which are highly flexible, porous chemical structures consisting of metal nodes and organic ligands.  MOFs have been compared to "molecular Legos"—because of their flexibility, MOFs are used as the building blocks for specific, tailor-made chemical structures.

17. As discussed further *infra*, through his pioneering research, Mr. Dilenschneider co-invented innovative technologies that use MOF membranes to extract metals, such as lithium, from liquids—the very use that became the foundation of EnergyX's business.  By making the extraction of lithium much easier, Mr. Dilenschneider's groundbreaking technologies offer a relatively cheap and environmentally friendly way to increase the world's lithium supply and thus support the production and growth of the many technologies that rely on lithium, such as smartphones, laptop computers, power tools, and electric vehicles.

18. Mr. Dilenschneider has authored several scholarly publications on MOFs and other important chemical engineering topics, and his work has been cited hundreds of times by others in the field.  He has also presented his research findings on MOFs and other topics at esteemed academic organizations such as the American Chemical Society and the North American Membrane Society.

19. As relevant here, Mr. Dilenschneider also spearheaded the development of a membrane-based nanotechnology for lithium extraction in collaboration with Monash University and the Commonwealth Scientific and Industrial Research Organization ("CSIRO").

7

20. Mr. Dilenschneider holds a Bachelor of Science in Chemical Engineering from the University of Notre Dame and is currently pursuing his PhD in Chemical and Biomolecular Engineering from that university. Before beginning his doctoral studies at Notre Dame, Mr. Dilenschneider was also a PhD student at the University of Texas at Austin Cockrell School of Engineering ("University of Texas") where he studied under Dr. Benny Freeman, another leading expert in MOF technology.

21. In addition to his academic research, Mr. Dilenschneider has also worked as a chemical engineer in the private sector for leading firms such as Owens Corning and MPW Industrial Services.

**B.  Mr. Dilenschneider Develops Innovative MOF Membrane Technology**

22. In 2017, after beginning his PhD studies at the University of Texas, Mr. Dilenschneider began researching ways to insert MOFs into membranes—a technique that had not been successfully achieved before.

23. Though MOFs have existed since the 1990s, their commercial applications were historically limited because they are fragile and break down quickly when used for commercial or industrial applications.

24. To address this issue, Mr. Dilenschneider and his co-inventors, Dr. Benny Freeman and Kevin Reimund, developed a membrane to hold MOFs and a process for encasing MOFs in that membrane. By inserting MOFs into a membrane, Mr. Dilenschneider and his co-inventors were able to improve their stability and make them more useful for commercial and industrial applications.

25. One such application for Mr. Dilenschneider's MOF-membrane technology is extracting metals and minerals from liquids, such as fluoride from drinking water or lithium from saltwater brines. Because of their flexibility, MOFs can be tailored so that the holes in their chemical

structure are large enough to let certain particles in a liquid mixture pass through while filtering other particles out.  The membrane created by Mr. Dilenschneider and his co-inventors ensures that the MOFs remain intact and continue performing the filtering process reliably.  In effect, the MOF-membrane technology developed by Mr. Dilenschneider and his co-inventors acts as a net that catches certain targeted particles and removes them from the relevant liquid.

26. Mr. Dilenschneider and his co-inventors' groundbreaking MOF-membrane technology is documented in and protected by two patents: one for the membrane they designed to hold MOFs (PCT No. PCT / US2020 / 047953) and another for the method they created for encasing MOFs into that membrane (PCT No. PCT / US2020 / 047955).

### C.  Mr. Dilenschneider and His Co-Inventors Meet with Potential Investors About Their Groundbreaking MOF-Membrane Technology

27. By mid-2018, Mr. Dilenschneider and his co-inventors had made substantial progress in developing their innovative MOF-membrane technology and began to speak with potential investors to explore additional funding for their groundbreaking research and possible commercial applications for the technology.

28. For example, in June 2018, Mr. Dilenschneider presented his MOF-membrane technology to the University of Texas's Engineering Advisory Board ("UT Advisory Board") for the purposes of seeking further research funding.  The UT Advisory Board is a dedicated group of industry leaders, alumni, and advocates who help the school and its students in a variety of ways, including fundraising.  Its members include several esteemed businesspeople and executives from top companies and investment firms such as Exxon Mobil, Lockheed Martin, and ABRY Partners.  Among its various purposes, the UT Advisory Board facilitates sponsorships from industry leaders and companies to fund the research of students like Mr. Dilenschneider.

29. Aside from meeting with the UT Advisory Board, Mr. Dilenschneider and his co-inventors met with other prospective business partners who were interested in commercializing their novel technology.  For example, in June 2018, Mr. Dilenschneider presented his MOF-membrane technology to Banoo Group, a private oil, gas and real estate firm.

30. In addition to these other parties, in the late summer of 2018, Teague Egan approached Mr. Dilenschneider and his co-inventors about potentially investing in their technology and the two sides had their first official meeting on August 18, 2018.  By that time, Mr. Dilenschneider and his co-inventors had already spoken to other prospective investors aside from Mr. Egan.  Critically, *when Mr. Egan first contacted Mr. Dilenschneider and his co-inventors*, *EnergyX did not exist.*

31. At the time Mr. Egan approached Mr. Dilenschneider and his co-inventors, Mr. Dilenschneider's MOF-membrane technology was already in an advanced stage of development.  Mr. Egan had no role in the technical development of the MOF-membrane technology, either before or after the summer of 2018.  Unlike Mr. Dilenschneider and his co-inventors, Mr. Egan is not an engineer or scientist and lacks the technical expertise to develop a technology like Mr. Dilenschneider's MOF-membrane system. The development of the MOF-membrane technology would not have been possible but for Mr. Dilenschneider and his co-inventors.

**D.  Mr. Dilenschneider Founds EnergyX to Develop MOF-Membrane Technology**

32. After meeting with potential investors in the summer of 2018, Mr. Dilenschneider traveled to Australia in October 2018 to conduct further research on his MOF-membrane technology with Monash University and CSIRO.

33. While Mr. Dilenschneider was on that research trip, Mr. Egan traveled to Australia to meet again with Mr. Dilenschneider and discuss the possibility of a potential commercial

10

venture.  Mr. Egan sought Mr. Dilenschneider out on this trip—Mr. Dilenschneider had no plans to meet with Mr. Egan before leaving for Australia and was not expecting to see him during his stay there.

34. During this trip, Mr. Dilenschneider and Mr. Egan discussed what would become EnergyX.  Mr. Egan told Mr. Dilenschneider that he was interested in developing a business founded on lithium extraction technology and Mr. Dilenschneider explained to Mr. Egan how to technologically scale such a business, including through use of Mr. Dilenschneider's MOF-membrane technology.

35. After Mr. Dilenschneider returned from Australia, he and Mr. Egan continued to discuss the possibility of going into business together.

36. In late October 2018, Mr. Dilenschneider and his co-inventors began to meet collectively with Mr. Egan and the University of Texas to discuss potential arrangements in which Mr. Egan or one of his affiliated entities would provide funding for Mr. Dilenschneider and his co-inventors' research.

37. Around this time, Mr. Dilenschneider also began working with Mr. Egan to solicit prospective investors and business partners for what would become EnergyX.  In connection with these efforts, Mr. Egan relied extensively on Mr. Dilenschneider's technical expertise, which Mr. Egan lacked.

38. For example, in mid-November 2018, while Mr. Egan and Mr. Dilenschneider were drafting a presentation for potential investors and business partners, Mr. Egan emailed Mr. Dilenschneider:

> I have included two decks in here.  The first part is an investor deck… ***The second part is the tech deck.  <u>This is where I need a lot of your help</u>.  We need to expand it as deep as possible*** without giving away our "trade secrets".  We are under NDA so confidential

11

information is OK, but you never want to give away the guts.  It doesn't matter how it works, as long as it works.

One of my favorite Bill Gates stories are [sic] when he told about his first meetings with IBM, his first clients [sic].  He went in there, and blew them away with information, making him look like the ***smartest guy in the room***, and that he knew literally everything about computer software.  He then promised them a product in 1-2 months (it took way longer).  This landed him the biggest computer client in the world.  I will show the excerpt from the book; ***this needs to be us***.

39. Mr. Dilenschneider eagerly provided his technical expertise, as Mr. Egan requested, and toured widely with Mr. Egan in late 2018 to explain the MOF-membrane technology to prospective investors and business partners.

40. By way of example only, throughout November and December 2018, Mr. Dilenschneider participated in discussions with prospective investors and business partners from Tesla, Bechtel, Trevi Systems Inc., Kairos Ventures, and Fiore Management & Advisory Corp.  Around the same time, he also accompanied Mr. Egan on a trip to Chile and Bolivia where they met with some of the largest lithium producers in the world, including Albemarle, Sociedad Química y Minera ("SQM"), and Yacimientos de Litio Bolivianos ("YLB").

41. Throughout these meetings, Mr. Dilenschneider provided the scientific know-how and *bona fides* essential to gaining credibility with the prospective investors and business partners he and Mr. Egan were meeting with.  The technology he and Mr. Egan were presenting to others was based on Mr. Dilenschneider's invention and Mr. Egan needed Mr. Dilenschneider to present it informedly and convincingly, which Mr. Egan could not do himself.  Mr. Egan recognized as much in real time, introducing Mr. Dilenschneider to others as his "lead engineer."

42. Critically, Mr. Dilenschneider took all these steps to develop the technology and help Mr. Egan market it ***before*** EnergyX formally started.  EnergyX was not incorporated until December 18, 2018, ***after*** Mr. Dilenschneider had already substantially developed the MOF-membrane

technology and helped Mr. Egan promote it to others throughout November and early December of that year.

43. EnergyX thus would not have existed but for Mr. Dilenschneider, his technology, and his efforts to help Mr. Egan market it. He was an essential co-founder of the company and undertook these efforts in reliance on having meaningful equity and governance rights in the enterprise.

### E. Mr. Dilenschneider Becomes EnergyX's Chief Science Officer and is Granted EnergyX Stock with Anti-Dilution Protections and Preferred Governance Rights

44. After helping to found the company, Mr. Dilenschneider was named its first Chief Science Officer, consistent with the role he had served throughout late 2018 before the company was formally organized.

45. On April 15, 2019, Mr. Dilenschneider entered a Consulting Services Agreement with EnergyX (the "Consulting Agreement") to formalize the terms of his service as Chief Science Officer. A true and correct copy of the Consulting Agreement is attached hereto as Exhibit 1.

46. As relevant here, under Section 3(b) of the Consulting Agreement, EnergyX agreed to "issue [Mr. Dilenschneider] restricted preferred stock and restricted common stock in the Company on the terms and conditions of an award agreement to be entered into between [Mr. Dilenschneider] and the Company (an 'Award Agreement') issued pursuant to an equity incentive plan to be adopted by the Company." Specifically, Mr. Dilenschneider would be granted a total of 7,500 shares: 5,000 shares of common stock and 2,500 shares of preferred stock, vesting in equal installments every six months over a four-year period. Ex. 1, § 3(b). This grant was intended to allocate Mr. Dilenschneider approximately 7.5% of EnergyX's total equity, based on the representation that Mr. Egan and/or his controlled entities held approximately 100,000 shares of

13

EnergyX's common stock on a fully diluted, as-converted basis prior to the issuance of Mr. Dilenschneider's shares.  *Id*.

47. As contemplated by the Consulting Agreement, on May 9, 2019, the parties entered a Restricted Stock Award Agreement.  A true and correct copy of the Restricted Stock Award Agreement is attached hereto as Exhibit 2.

48. Under Section 1 of that agreement, EnergyX "[i]ssued to [Mr. Dilenschneider] on the Grant Date an Award of Restricted Stock consisting of five thousand (5,000) shares of the Common Stock, and two thousand five hundred (2,500) shares of Preferred Stock (collectively, the 'Company Stock'), on the terms and conditions and subject to the restrictions set forth in this Agreement and the [Special Equity Incentive] Plan."  A true and correct copy of the Special Equity Incentive Plan is attached hereto as Exhibit 3.

49. Section 7 of the Restricted Stock Award Agreement expressly provides that "[i]f *any change* is *made to the outstanding capital stock or capital structure of the Company*, if required, the *shares of Company Stock* [granted to Mr. Dilenschneider] *shall be adjusted* or terminated in any manner as contemplated by Section 9 of the [Special Equity Incentive] Plan."

50. The Special Equity Incentive Plan, in turn, states:

> In the event of *changes in the outstanding capital stock or in the capital structure of the Company* by reason of any stock or extraordinary cash dividend, stock split, reverse stock split, an extraordinary corporate transaction such as *any recapitalization*, reorganization, merger, consolidation, combination, exchange, or *other relevant change in capitalization* occurring after the Grant Date of any Award, *Awards granted under the Plan and any Award Agreements* and the maximum number of shares of Restricted Stock subject to Awards stated in Section 4 *will be equitably adjusted or substituted, as to the number, price or kind of a share of Common Stock or other consideration subject to such Awards to the extent necessary to preserve the economic intent of such Award*.

> Ex. 3, § 9.

51. Accordingly, the Restricted Stock Award Agreement and the Special Equity Incentive Plan provide Mr. Dilenschneider with anti-dilution rights protecting him from having his shares diluted because of any change in the capitalization or capital structure of EnergyX. Indeed, the Special Equity Incentive Plan expressly describes these as "anti-dilution adjustments." *See* Ex. 3, § 3.1(i).

**F. EnergyX Terminates the Consulting Agreement While Mr. Dilenschneider Is Experiencing a Health Crisis**

52. After formalizing his arrangement with EnergyX through the Consulting Agreement and Restricted Stock Award Agreement, Mr. Dilenschneider continued helping grow the company throughout 2019.

53. Consistent with the role he had always played, Mr. Dilenschneider continued to lend his scientific know-how and professional credentials to the company, which were key to it gaining traction and credibility. Indeed, EnergyX extolled Mr. Dilenschneider's experience and credentials in its public statements, such as a September 2019 press release in which it relied on him to explain MOF membranes. A true and correct copy of this press release is attached hereto as Exhibit 4.

54. As explained, EnergyX's foundational technology was based on Mr. Dilenschneider's inventions. In fact, to this day, the patents to EnergyX's technology continue to rely upon and incorporate by reference the same MOF-membrane technology Mr. Dilenschneider and his co-inventors were developing when Mr. Dilenschneider first met Mr. Egan in the summer of 2018.

55. Mr. Dilenschneider also contributed directly to the company's business and operations, taking a leading role in continuing to forge relationships with potential business partners and funders and helping the company recruit other top executives, such as the Chief Financial Officer.

15

56. Despite Mr. Dilenschneider's many contributions, however, Mr. Egan tactically seized on a serious medical emergency Mr. Dilenschneider experienced in late 2019 to push him out of the company.

57. In the fall of 2019, Mr. Dilenschneider suffered an acute mental health crisis that required voluntary hospitalization. He promptly informed EnergyX and Mr. Egan of his medical condition in real time and communicated his intent to return to work upon his recovery.

58. Specifically, on September 23, 2019, Mr. Dilenschneider emailed Mr. Egan and explained that he had recently experienced "some health changes that have begun to severely impact my personal and work life" and stated he would be "reducing [his] involvement with EnergyX to focus on returning myself to a point of normalcy." Mr. Dilenschneider expressed his openness to discussing what this reduction would entail. Mr. Dilenschneider did not propose to permanently terminate his role with EnergyX and he never voluntarily quit the company.

59. In October 2019, shortly after Mr. Dilenschneider sent this email to Mr. Egan, he voluntarily hospitalized himself for treatment of possible mental illness. During this hospital stay, Mr. Dilenschneider was diagnosed with Bipolar 1 Disorder. The acute episode Mr. Dilenschneider was experiencing at this time severely impacted his ability to sleep and think clearly. Mr. Dilenschneider remained hospitalized for more than a week until November 5, 2019.

60. While Mr. Dilenschneider was hospitalized, Mr. Egan emailed Mr. Dilenschneider on October 24 to suggest that Mr. Dilenschneider cease acting as EnergyX's Chief Science Officer due to his medical condition. Specifically, Mr. Egan stated: "My number one priority is to see you get better and support you in any way that I can. Because of that, at this time I don't think it's fair to either of us for you to continue in an official capacity as the Chief Science Officer at

16

EnergyX.  The extra workload, stress, and pressure, on top of school obligations is probably a lot to cope with given your current circumstances."

61. In this communication, Mr. Egan did not suggest that Mr. Dilenschneider had breached his Consulting Agreement with EnergyX in any way.  To the contrary, in his October 24 email, Mr. Egan applauded Mr. Dilenschneider's contributions to the company, stating: "***Working with you over the past year has been nothing but a pleasure.  Your progress in the lab, and support on business meetings has been instrumental to the success we have had at EnergyX thus far***."  Mr. Egan also welcomed continuing to work with Mr. Dilenschneider, stating: "This by no means is an indication we don't want to work with you.  We would love the opportunity to work with you again in the future after you are in better health, and I suggest we revisit the topic in 6 months or so."

62. Nevertheless, at the end of his October 24 email, Mr. Egan tacked on the following: "P.S. - From a purely administrative perspective, this email serves as notice pursuant to Section 7(b) in relation to Section 2 of our Consulting Agreement."  Section 7(b) of the Consulting Agreement allows either party to terminate the agreement based upon a "breach or default of any material obligations contained herein" by the other party, provided the terminating party first provides two weeks' written notice and an opportunity to cure.  But Mr. Egan's October 24 email does not identify any purported grounds on which Mr. Dilenschneider breached or materially defaulted on the Consulting Agreement.  Instead, the only basis for ending Mr. Dilenschneider's tenure as Chief Science Officer identified by Mr. Egan in his October 24 email was Mr. Dilenschneider's medical incapacity—a circumstance beyond Mr. Dilenschneider's control.

17

63. Mr. Dilenschneider did not immediately see Mr. Egan's October 24 email because he was incapacitated and then hospitalized due to his mental illness around that time and continued to recuperate from his ordeal for weeks after being discharged.

64. Shortly after Mr. Dilenschneider was discharged, Mr. Egan and EnergyX sent him a letter dated November 8, 2019, which purported to confirm termination of the Consulting Agreement, claiming it was effective October 24, 2019. A true and correct copy of that November 8, 2019 letter is attached hereto as Exhibit 5.

65. EnergyX's assertion that the Consulting Agreement was terminated effective October 24, 2019 was wrong for several reasons. *First*, EnergyX had not properly noticed a termination under Section 7(b) of the Consulting Agreement on October 24, 2019 because it did not give Mr. Dilenschneider notice of any purported breach or material default by him of the Consulting Agreement nor an opportunity to cure any such purported breach or material default. *Second*, any termination under Section 7 of the Consulting Agreement is effective only after the expiration of the required notice and cure period—it is not effective on the date notice is given. Though Section 7(a) of the Consulting Agreement gives either party the option to terminate the agreement for any reason, that requires 30 days' written notice. Ex. 1, § 7(a). Thus, the earliest EnergyX could have effectively terminated the Consulting Agreement was November 23, 2019, i.e. 30 days from Mr. Egan's October 24 email.

66. Despite its other flaws, EnergyX's November 8, 2019 email rightly recognized that its purported termination of the Consulting Agreement had not affected Mr. Dilenschneider's right to vest the first tranche of his EnergyX equity under the Restricted Stock Award Agreement. In no uncertain terms, EnergyX "confirm[ed]" that Mr. Dilenschneider "[held] 313 vested shares of the

18

Company's Series A-2 Preferred Stock and 625 vested shares of the Company's Common Stock." Ex. 5.

67. Since sending Mr. Dilenschneider this letter in November 2019, EnergyX has consistently recognized Mr. Dilenschneider as a shareholder and, until just a few weeks ago, never suggested that EnergyX's purported termination of the Consulting Agreement under Section 7(b) thereof impacted Mr. Dilenschneider's equity in the company.

68. As reflected in the Consulting Agreement, Mr. Egan and/or his affiliated entities controlled approximately 100,000 shares of EnergyX's stock on a fully diluted, as-converted basis as of the termination of the Consulting Agreement in November 2019. Ex. 1, § 3(b). The 938 total shares Mr. Dilenschneider held as of November 2019 thus represented approximately 0.938% of EnergyX. Per his anti-dilution rights under the Restricted Stock Award Agreement and the Special Equity Incentive Plan, Mr. Dilenschneider is entitled to maintain that level of ownership in EnergyX.

**G. EnergyX Wrongfully Dilutes Mr. Dilenschneider's Equity and Strips Away his Preferred Equity Rights**

69. Despite terminating the Consulting Agreement, EnergyX continued to hold Mr. Dilenschneider out publicly as the company's Chief Science Officer for an extended period after the purported termination date.

70. For example, on September 16, 2020—nearly a year after EnergyX purported to terminate the Consulting Agreement—EnergyX put out a press release identifying Mr. Dilenschneider as the company's Chief Science Officer. The press release even included a picture of Mr. Dilenschneider along with Mr. Egan, EnergyX's Chief Financial Officer, and other science and engineering directors for EnergyX:

19



From left to right: Top row - Teague Egan (EnergyX CEO), Dr. Benny Freeman (UT Professor of Chemical Engineering & EnergyX Science Advisory Board Chairman), TJ Dilenschneider (EnergyX Chief Science Officer), Kevin Reimund (EnergyX Director of Membrane Engineering), Bob Wowk (EnergyX CFO), Bottom Row - Dr. John Goodenough

A true and correct copy of that press release is attached hereto as Exhibit 6.

71. But even as EnergyX continued to publicly characterize Mr. Dilenschneider as its Chief Science Officer and rely on his many scientific and other contributions to the business, it began to secretly dilute his equity stake and strip away his governance rights as a preferred shareholder, in violation of Mr. Dilenschneider's legal rights.

### a.  EnergyX Wrongfully Cuts Mr. Dilenschneider's Equity by Nearly 40%

72. Although the Restricted Stock Award Agreement and the Special Equity Incentive Plan entitle Mr. Dilenschneider to maintain 0.938% of EnergyX's equity, the company cut his holdings by nearly 40% through a series of improperly dilutive financing transactions without providing contemporaneous notice to Mr. Dilenschneider.

73. Specifically, EnergyX diluted Mr. Dilenschneider's stake by issuing tens of millions of new shares of Series A preferred stock, Series B preferred stock, and Common Stock in the time since Mr. Egan and EnergyX pushed Mr. Dilenschneider out of the company. Whereas EnergyX had just over 100,000 total shares on a fully diluted, as-converted basis when Mr. Dilenschneider was forced out, the company now has over 195 million total shares outstanding. Each of these stock issuances constituted a change to EnergyX's "outstanding capital stock" and "capital

structure" done through a "recapitalization" or "other relevant change in capitalization" for EnergyX, and thus triggered Mr. Dilenschneider's anti-dilution rights under the Restricted Stock Award Agreement and the Special Equity Incentive Plan.

74. In violation of his contractual rights, as EnergyX issued these new shares, it failed to adjust Mr. Dilenschneider's holdings such that he maintained the 0.938% stake he was promised under the Restricted Stock Award Agreement and the Special Equity Incentive Plan.

75. As a result, Mr. Dilenschneider's outstanding equity stake has been improperly diluted from 0.938% to 0.572%.

     **b.**   **EnergyX Wrongfully Strips Away Mr. Dilenschneider's Preferred Stock Rights**

76. In addition to wrongfully diluting his shares, EnergyX also wrongfully stripped away Mr. Dilenschneider's rights as a preferred stockholder.

77. As explained, by November 2019, Mr. Dilenschneider had vested 313 shares of the Company's Series A-2 Preferred Stock. That Series A-2 Preferred Stock carried substantial economic and governance rights, including: (i) dividend preferences relative to other classes of stock; (ii) voting rights equal to fifty (50) times the number of Common shares into which the Series A-2 Preferred Stock was convertible; and (iii) class consent rights over several categories of significant corporate actions, including any amendment to the certificate of incorporation that adversely affected the powers, preferences, or rights of the Series A Preferred Stock.

78. In or about November 2020, EnergyX adopted its Second Amended and Restated Certificate of Incorporation (the "Second Amended Certificate"), though Mr. Dilenschneider was not aware of that fact at the time. Pursuant to that certificate, each share of Mr. Dilenschneider's Series A-2 Preferred Stock was exchanged and converted into 100 shares of Founders-2 Preferred

21

Stock. However, despite the nominal conversion, Mr. Dilenschneider's aforementioned governance rights as a preferred stockholder remained substantially the same.

79. Importantly, Mr. Dilenschneider was the only EnergyX shareholder who held Founders-2 Preferred Stock (and the Series A-2 Stock that preceded it). This was the preferred stock Mr. Dilenschneider, and Mr. Dilenschneider alone, received for his role in founding EnergyX.

80. Then, in or about April 2021, without giving any notice to Mr. Dilenschneider, EnergyX purported to adopt a Third Amended and Restated Certificate of Incorporation (the "Third Amended Certificate"). The Third Amended Certificate materially and adversely affected Mr. Dilenschneider's Founders-2 Preferred Stock in at least three respects. *First*, it created a new Series A Preferred Stock and gave that series a substantial distribution preference over Mr. Dilenschneider's Founders-2 Preferred Stock. *Second*, it diluted the voting rights of Mr. Dilenschneider's Founders-2 Preferred Stock by forcing those shares to vote as a class with the new Series A Preferred Stock and other stockholders. *Third*, it subjected Mr. Dilenschneider's Founders-2 Preferred Stock to mandatory conversion to Common Stock upon new trigger events, including upon any initial public offering that raised at least $20 million in gross proceeds at a closing price of at least $50 per share or upon a preferred stockholder vote that would now include the new Series A Preferred Stock. The Third Amended Certificate also purported to change the par value of Mr. Dilenschneider's Founders-2 Preferred Stock from $0.00001 to $0.01.

81. Despite purporting to strip substantial rights attaching to Mr. Dilenschneider's Founders-2 Preferred Stock, EnergyX never informed Mr. Dilenschneider that it was contemplating the Third Amended Certificate. EnergyX did not notify Mr. Dilenschneider of any stockholder meeting where the Third Amended Certificate was to be discussed, nor did it give Mr. Dilenschneider an

22

opportunity to vote on—or even object to—the proposed changes to his unique series of preferred stock.

82. EnergyX's failure to notify Mr. Dilenschneider about the Third Amended Certificate before its purported adoption and afford him an opportunity to vote on it violated the Puerto Rico General Corporations Act.

83. Section 3682(b) of the Puerto Rico General Corporations Act ("Corporations Act") expressly states that holders of outstanding shares of a class, or any specific series thereof (as the case may be), are entitled to vote as a class, or series, upon any proposed amendment to the certificate of incorporation that would (among other things) increase or decrease the par value of the shares or alter or change the "preferences, special powers, or rights" of such class or series of shares so as to affect them adversely.  14 L.P.R.A. §§ 3682(b).  Section 3682(b) of the Corporations Act further requires that such a stockholder vote be conducted at a special or annual meeting with written notice thereof to be provided not less than 10 days and not more than 60 days before the meeting is held, as provided for under Section 3652 of the Corporations Act. 14 L.P.R.A. §§ 3682(b), 3652.   EnergyX violated these portions of the Corporations Act by denying Mr. Dilenschneider his right to vote on the Third Amended Certificate.

84. Because the Third Amended Certificate was adopted in direct violation of the voting and notice requirements of Sections 3682(b) and 3652 of the Corporations Act, the Third Amended Certificate and all subsequent amended certificates are void and without legal effect.

### H. EnergyX Purports to Convert Mr. Dilenschneider's Founders-2 Preferred Stock by Concealing Material Information

85. In early 2021, shortly before EnergyX purported to adopt the Third Amended Certificate, Mr. Egan contacted Mr. Dilenschneider to inquire as to whether he would be willing to sell his EnergyX shares, but these discussions were unfruitful.

23

86. A few months later, after EnergyX purported to adopt the Third Amended Certificate, Mr. Egan reapproached Mr. Dilenschneider and demanded that he convert his Founders-2 Preferred Stock to Common Stock. That Mr. Egan reached out to demand Mr. Dilenschneider convert his shares was unusual and inverted the process contemplated by EnergyX's certificate of incorporation. Under the certificate of incorporation, Mr. Dilenschneider, as a Founders-2 Preferred Stockholder, was supposed to notify EnergyX of his desire to convert his preferred stock to Common Stock. Here, EnergyX and Mr. Egan did the inverse, strongly suggesting the purpose of their demand was to take advantage of Mr. Dilenschneider.

87. In making this demand, EnergyX and Mr. Egan did not disclose that EnergyX had purported to adopt the Third Amended Certificate and thereby strip away substantial rights from Mr. Dilenschneider's Founders-2 Preferred Stock. As explained, EnergyX failed to notify Mr. Dilenschneider that it was considering the Third Amended Certificate before purporting to adopt it and never gave Mr. Dilenschneider an opportunity to vote on it. Thus, when Mr. Egan asked Mr. Dilenschneider to convert his Founders-2 Preferred Stock to Common Stock, Mr. Dilenschneider had no idea that EnergyX had purported to adopt the Third Amended Certificate or take away and dilute many of his rights as a Founder-2 Preferred Stockholder.

88. As it turned out, when Mr. Egan approached Mr. Dilenschneider about converting his Founders-2 Preferred Stock, EnergyX was also considering adopting a further amendment to its Third Amended Certificate. Mr. Egan also failed to disclose this fact to Mr. Dilenschneider when he demanded that Mr. Dilenschneider convert his Founders-2 Preferred Stock.

89. In addition, around this time, Mr. Dilenschneider's mental faculties were seriously impaired due to the same mental illness that had led to his voluntary hospitalization in the fall of 2019. Due to his mental illness, Mr. Dilenschneider was unable to sleep regularly nor consistently

24

think logically and was prone to impulsive decision-making and mood swings. He was thus in no position to make any serious business or financial decisions. From their experience dating back to 2019, Mr. Egan understood Mr. Dilenschneider suffered from Bipolar 1 and was prone to acute bouts that seriously impaired his cognitive abilities.

90. Nevertheless, despite concealing material information and Mr. Dilenschneider's mental infirmity, Mr. Egan presented Mr. Dilenschneider with a conversion memorandum pursuant to which Mr. Dilenschneider would purportedly convert his Founders-2 Preferred Stock to Common Stock. In a telephone call held shortly before Mr. Egan presented Mr. Dilenschneider with the conversion memorandum, Mr. Egan told Mr. Dilenschneider that Mr. Dilenschneider owned far more shares of EnergyX than Mr. Dilenschneider believed he did. Though the number of shares Mr. Dilenschneider owned was the result of stock splits EnergyX had failed to inform him about, the content and character of Mr. Egan's statement gave Mr. Dilenschneider the misimpression that signing the conversion memorandum would be in his best interest.

91. That memorandum itself contained materially misleading information. Specifically, the memorandum stated that the conversion was being done pursuant to the "Amended and Restated Certificate of Incorporation," but EnergyX's internal corporate documents show that the Amended and Restated Certificate of Incorporation had been supplanted with several further amendments by the time Mr. Egan demanded Mr. Dilenschneider convert his Founders-2 Preferred Stock. This includes the Third Amended Certificate, which was entered *months* before Mr. Egan approached Mr. Dilenschneider about converting his Founders-2 Preferred Stock.

92. Tellingly, the Amended and Restated Certificate of Incorporation was the version of EnergyX's certificate that had been in effect in November 2019, when Mr. Dilenschneider's stock had vested and when Mr. Egan had unceremoniously pushed Mr. Dilenschneider out of the

company.   The reference to the "Amended and Restated Certificate of Incorporation" in the memorandum Mr. Egan presented to Mr. Dilenschneider thus gave the impression that there had not been any changes to EnergyX's capital structure and governance documents since November 2019, which Mr. Egan and EnergyX knew to be false.  Moreover, the reference to the "Amended and Restated Certificate of Incorporation" also wrongly concealed that EnergyX had purported to adopt the Third Amended Certificate months earlier and thereby strip Mr. Dilenschneider of important rights as a Founder-2 Preferred Stockholder.

93. Had Mr. Dilenschneider known of the existence of the Third Amended Certificate and its purported impact on his Founder-2 Preferred Stockholder rights; the fact that EnergyX was considering a further amendment to the Third Amended Certificate; and the fact that the number of EnergyX shares he owned before the conversion was the product of prior stock splits and unrelated to the conversion itself, he would not have signed the conversion memorandum presented to him by Mr. Egan.

94. But, as described, Mr. Egan and EnergyX concealed and misled Mr. Dilenschneider about these highly material facts.  Lacking this critical information and suffering from serious cognitive impairment due to his mental illness, Mr. Dilenschneider signed the conversion memorandum at Mr. Egan's urging.

95. In a text message sent immediately after Mr. Dilenschneider signed, Mr. Egan reiterated "You have a lot of shares in EX," repeating the same misleading message he had given Mr. Dilenschneider on their earlier phone call, which had wrongly led Mr. Dilenschneider to believe the conversion was to his benefit.

96. Given the deception EnergyX and Mr. Egan used to secure Mr. Dilenschneider's signature and the cognitive impairment that Mr. Dilenschneider was experiencing at the time, the conversion

26

of his Founders-2 Preferred Stock is legally unenforceable and he remains a Founders-2 Preferred Stockholder.

**I.  After EnergyX Conceals Its Misconduct, Mr. Dilenschneider Finally Discovers It**

97. After Mr. Egan pushed Mr. Dilenschneider out of EnergyX in November 2019, EnergyX did not provide Mr. Dilenschneider with notice of its purported amendments to the company's certificates of incorporation, its equity financing and recapitalization transactions, nor other regular information about his stockholdings in the company.  As the episode surrounding the purported conversion of Mr. Dilenschneider's Founders-2 Preferred Stock demonstrates, what little information EnergyX did provide him was incomplete and misleading.  Accordingly, Mr. Dilenschneider was totally unaware in real time that his equity had been diluted or that his rights as a Series-2 Preferred Stockholder had been materially impaired.

98. EnergyX did not provide Mr. Dilenschneider with access to its capitalization table until February 2024, when it finally allowed him onto its Carta system—a common electronic platform used by companies to track their issued and outstanding equity.  Before that time, Mr. Dilenschneider had no ability to track whether or how his percentage ownership in EnergyX had changed.

99. Even then, EnergyX did not provide information about the changes it had purported to make to its certificate of incorporation and its impact on Mr. Dilenschneider's Founders-2 Preferred Stock.  Mr. Dilenschneider did not discover that the company had purported to make those changes until February 2026, when he learned the company was conducting a further Regulation A fundraise and he began to do further research.

27

**J.   Mr. Dilenschneider Is Forced to Bring This Suit After EnergyX Threatened to Strip Him of His Remaining Equity**

100. After discovering that EnergyX had wrongfully diluted his equity and purported to strip him of important rights as a Founders-2 Preferred Stockholder, he promptly sent a letter to EnergyX on March 27, 2026 to request that it restore both his percentage ownership to 0.938% and his Founders-2 Preferred Stock and the rights attaching thereto as they existed before the purported adoption of the Third Amended Certificate.

101. EnergyX apparently read Mr. Dilenschneider's March 27 letter as soon as it received it. Within hours of Mr. Dilenschneider sending the letter through counsel, Mr. Egan began to research Mr. Dilenschneider's counsel on LinkedIn. Nevertheless, EnergyX ignored Mr. Dilenschneider's letter for weeks.

102. More than two weeks after receiving the letter, Mr. Egan sent Mr. Dilenschneider a text message promising to allow him to sell some of his EnergyX stock in a private sale if Mr. Dilenschneider would agree to retract his letter. Importantly, in that text message, Mr. Egan did not dispute the substance of Mr. Dilenschneider's March 27 letter with any detailed information.

103. After Mr. Dilenschneider repeatedly followed up through counsel, EnergyX finally responded by letter on May 1, 2026. But rather than engage with the merits of Mr. Dilenschneider's March 27 letter, EnergyX threatened him. For the first time ever, EnergyX intimated that Mr. Dilenschneider had not met the vesting milestone for the first tranche of the equity owed to him under the Restricted Stock Award Agreement and was thus not a stockholder of EnergyX at all.

104. EnergyX's threat is absurd. EnergyX has repeatedly recognized Mr. Dilenschneider as one of its stockholders. It sent him a notice in November 2019 confirming that he had vested common and preferred stock. Ex. 5. Through Mr. Egan, it approached him in early 2021 and

28

asked to buy out his stock. After that effort failed, it demanded he convert his Founders-2 Preferred Stock into Common Stock. To this day, it lists Mr. Dilenschneider as one of its stockholders in Carta and has issued him certificates confirming his equity ownership. Though EnergyX wrongfully diluted Mr. Dilenschneider's equity and stripped him of important rights as a Founders-2 Preferred Stockholder, the company never contested Mr. Dilenschneider was a stockholder until just a few weeks ago, after Mr. Dilenschneider had raised his own claims.

105. Mr. Dilenschneider promptly responded to and refuted EnergyX's baseless threat on May 8, 2026, but the company has refused to engage since then, wrongfully causing uncertainty as to whether the company intends to take unwarranted adverse action against Mr. Dilenschneider's shares.

106. Thus, despite his repeated attempts to resolve this dispute outside of litigation, Mr. Dilenschneider was forced to bring this case to protect and restore his equity rights.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT

107. Mr. Dilenschneider realleges and incorporates by reference each and every allegation set forth above as if fully stated herein.

108. The Consulting Agreement, the Restricted Stock Award Agreement, and the Special Equity Incentive Plan constitute valid, binding, and enforceable contracts between Mr. Dilenschneider and EnergyX. Mr. Dilenschneider performed all of his obligations thereunder.

109. EnergyX breached the Restricted Stock Award Agreement and the Special Equity Incentive Plan by failing to equitably adjust Mr. Dilenschneider's shares in connection with each subsequent equity raise and capitalization change, as expressly required by the anti-dilution provisions of those agreements. As a direct and proximate result of these breaches, Mr.

29

Dilenschneider's ownership stake was wrongfully reduced from the guaranteed minimum of 0.938% to 0.572%.

110. As a direct and proximate result of EnergyX's breach, Mr. Dilenschneider has suffered economic damages in excess of $75,000 in an amount to be proven at trial, including the loss of the economic value represented by the diluted equity and all associated distributions, dividends, and proceeds to which he is entitled as a properly adjusted stockholder.

## COUNT II
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

111. Mr. Dilenschneider realleges and incorporates by reference each and every allegation set forth above as if fully stated herein.

112. The contracts between the parties imposed on EnergyX an implied covenant of good faith and fair dealing, requiring it to act honestly and in a manner consistent with the reasonable expectations of the parties and the purposes for which the contracts were made.

113. EnergyX violated this covenant by, among other things: terminating the Consulting Agreement while Mr. Dilenschneider was medically incapacitated and hospitalized; deliberately withholding corporate information to prevent him from monitoring his equity; engineering dilutive equity issuances without honoring his anti-dilution rights; and manipulating him into signing a conversion memorandum based on misleading and incomplete information.

114. As a direct and proximate result of EnergyX's breach of the implied covenant, Mr. Dilenschneider has suffered economic and other damages in excess of $75,000 in an amount to be proven at trial.

30

## COUNT III
### VIOLATION OF 14 L.P.R.A. § 3682(b) and 3652 — UNLAWFUL AMENDMENT OF CERTIFICATE OF INCORPORATION

115. Mr. Dilenschneider realleges and incorporates by reference each and every allegation set forth above as if fully stated herein.

116. Section 3682(b) of the Corporations Act requires that holders of a class of stock, or series thereof, receive an opportunity to vote as a class or series before any amendment to the certificate of incorporation is adopted that would adversely affect the preferences, special powers, or rights of their shares. Section 3682(b) also mandates that holders of a class of stock be afforded an opportunity to vote on any amendment to the certificate of incorporation that would increase or decrease the par value of their shares.  Under Sections 3682 and 3652 of the Corporations Act, any such vote must be conducted at a special or annual meeting of the stockholders with notice of any such meeting to be provided not less than 10 days and not more than 60 days in advance.

117. The Third Amended Certificate adversely altered the preferences, powers, and rights of Mr. Dilenschneider's Founders-2 Preferred Stock in multiple material respects, including by subjecting his shares to a distribution preference given to a new class of Series A Preferred Stock, diluting his voting rights, and imposing new mandatory conversion conditions.

118. EnergyX adopted the Third Amended Certificate without providing Mr. Dilenschneider with any notice of a meeting, without affording him any opportunity to vote as a member of the affected series, and without complying with the procedural requirements of Sections 3682(b) and 3652 of the Corporations Act. The Third Amended Certificate and all subsequent amendments thereto are therefore void and without legal effect.

31

119. Mr. Dilenschneider is entitled to a declaration that the Third Amended Certificate and all subsequent certificates are void, and to restoration of all rights he held as a Founders-2 Preferred Stockholder under the Second Amended Certificate.

## COUNT IV
## FRAUD AND FRAUDULENT MISREPRESENTATION

120. Mr. Dilenschneider realleges and incorporates by reference each and every allegation set forth above as if fully stated herein.

121. EnergyX, via its agent, Mr. Egan, made material misrepresentations and omissions to Mr. Dilenschneider in connection with the purported conversion of his Founders-2 Preferred Stock. Specifically, Mr. Egan: (i) presented Mr. Dilenschneider with a conversion memorandum that invoked an outdated certificate of incorporation that did not govern Founders-2 Preferred Stock and falsely gave the impression that EnergyX had not made any changes to its capital structure or corporate governance documents since the time Mr. Dilenschneider was forced out of the company, (ii) concealed the existence of the Third Amended Certificate and its adverse effects on Mr. Dilenschneider's Founders-2 Preferred Stock, and (iii) concealed the forthcoming additional amendment to the Third Amended Certificate, which EnergyX adopted within weeks of Mr. Dilenschneider signing the conversion memorandum.  In addition, during a phone conversation that pre-dated Mr. Dilenschneider signing the conversion memorandum, Mr. Egan made misleading statements about the number of shares Mr. Dilenschneider owned in EnergyX, which he repeated after Mr. Dilenschneider signed the memorandum.

122. These misrepresentations were made knowingly and intentionally. EnergyX knew that the Third Amended Certificate had been adopted and that it materially adversely affected Mr. Dilenschneider's Founders-2 Preferred Stock.  EnergyX also knew that the number of shares Mr. Dilenschneider held before the conversion was the product of stock splits it had not informed Mr.

32

Dilenschneider about and that the number of shares he held pre-conversion was unrelated to whether the conversion was a beneficial transaction for Mr. Dilenschneider.  EnergyX knew that Mr. Dilenschneider was not aware of these facts, was suffering from cognitive impairment, and was not represented by counsel. EnergyX made these misrepresentations and omissions, via its agent, Mr. Egan, for the purpose of inducing Mr. Dilenschneider to surrender his Founders-2 Preferred Stock and its attendant rights.

123. Mr. Dilenschneider justifiably relied on EnergyX's misrepresentations. Had he been provided with accurate and complete information regarding the Third Amended Certificate and its effects as well as the number of shares he held pre-conversion, he would not have agreed to the conversion.

124. As a direct and proximate result of EnergyX's fraud, Mr. Dilenschneider has suffered damages, including the loss of his Founders-2 Preferred Stock and all associated economic and governance rights. Mr. Dilenschneider is also entitled to punitive damages in light of EnergyX's willful, knowing, and intentional misconduct.

## COUNT V
## DECLARATORY JUDGMENT

125. Mr. Dilenschneider realleges and incorporates by reference each and every allegation set forth above as if fully stated herein.

126. An actual, justiciable controversy exists between the parties regarding Mr. Dilenschneider's equity stake in EnergyX, his rights as a Founders-2 Preferred Stockholder, the validity of the Third Amended Certificate and subsequent certificates, and the enforceability of the purported conversion.

127. Plaintiff is entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201: (a) that his equity in EnergyX must be adjusted upward to no less than 0.938% consistent with his contractual

33

anti-dilution rights; (b) that the Third Amended Certificate and all subsequent amendments thereto are void and without legal effect; (c) that Mr. Dilenschneider retains all rights as a Founders-2 Preferred Stockholder under the Second Amended Certificate; (d) that the purported conversion of his Founders-2 Preferred Stock is void and unenforceable; and (e) that Mr. Dilenschneider vested preferred and common stock in EnergyX as EnergyX confirmed in its November 8, 2019 letter.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Theodore Dilenschneider respectfully requests that this Court enter judgment in his favor and against EnergyX, and grant the following relief:

A. An award of compensatory damages in excess of $75,000 in an amount to be proven at trial, including the full economic value of the equity wrongfully diluted from Mr. Dilenschneider's contractually guaranteed ownership stake;

B. A declaration that Mr. Dilenschneider's equity in EnergyX must be restored to no less than 0.938% consistent with his anti-dilution rights, and an order directing EnergyX to effect such restoration forthwith;

C. A declaration that the Third Amended Certificate and all subsequent amendments thereto are void and without legal effect;

D. A declaration that the purported conversion of Mr. Dilenschneider's Founders-2 Preferred Stock is void and unenforceable, and an order restoring all rights he holds as a Founders-2 Preferred Stockholder under the Second Amended Certificate;

E. A declaration that Mr. Dilenschneider vested preferred and common stock in EnergyX as EnergyX confirmed in its November 8, 2019 letter;

F. An award of punitive damages in an amount sufficient to punish EnergyX for its willful, knowing, and fraudulent misconduct and to deter similar conduct in the future;

34

G.  An award of attorneys' fees and costs to the extent permitted by law;

H.  An accounting of any dividends declared with respect to Mr. Dilenschneider's Founders-2 Preferred Stock;

I.  Pre- and post-judgment interest at the maximum rate permitted by law; and

J.  Such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Theodore Dilenschneider hereby demands a trial by jury on all issues so triable.

/s/ Manuel Pietrantoni
Manuel Pietrantoni
Carolina Velaz Rivero
Marini Pietrantoni Muñiz LLC
250 Ponce de León, Suite 900
San Juan, PR 00918
787-705-2171
mpietrantoni@mpmlawpr.com
cvelaz@mpmlawpr.com

*Counsel for Plaintiff Theodore Dilenschneider*

Dated: May 29, 2026

35