# Exhibit 1

**CONSULTING SERVICES AGREEMENT**

**THIS CONSULTING SERVICES AGREEMENT** (the "Agreement") is made as of April ___15___, 2019, by and between **THEODORE DILENSCHNEIDER** ("Consultant"), and **ENERGY EXPLORATION TECHNOLOGIES, INC.**, a Puerto Rico corporation (the "Company").

**RECITALS**

The Company is a sustainable energy company focussed on lithium extraction technology, forward osmosis and thermal powered desalination.  Consultant desires to provide services as the Company's Chief Scientific Officer, and the Company desires to retain Consultant for such services, in each case, on the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Consultant mutually agree as follows:

1. Engagement; Services.  The Company hereby engages Consultant to provide and perform the services listed on Exhibit A attached hereto (the "Services") to or for the benefit of the Company, and Consultant hereby accepts such engagement with the Company and agrees to provide and perform the Services, upon the terms, covenants and conditions set forth in this Agreement.  In addition, Consultant agrees to serve as on the Company's Board of Directors for a two (2) year term, subject to his earlier resignation, removal, death or disability.  Consultant currently is a graduate student in the chemical engineering program at, and working for, the University of Texas at Austin (the "University").

2. Duties.  Consultant shall diligently and competently perform the Services to the best of its ability, and shall devote sufficient business time and energy to the Company so as to diligently perform the Services and its duties hereunder.  Consultant shall perform its duties in a manner in compliance with all applicable laws and regulations and in accordance with applicable policies and procedures set forth from time to time by the Company, so long as the same do not conflict with the terms of this Agreement or his duties and responsibilities to the University Consultant will at all times keep the Company reasonably informed as to the status of its Services and other duties and obligations under this Agreement.

3. Compensation.  In consideration of the Services to be rendered hereunder, the Company shall pay or provide to Consultant the following compensation:

(a) Consulting Fee.  During the Term (as defined below), the Company shall pay to Consultant, and/or cause the University to pay to Consultant pursuant to funds paid by the Company under its sponsored research agreement with the University, a monthly consulting fee in the aggregate amount of Four Thousand Dollars ($4,000). The portion payable by the Company to Consultant shall be payable, in arrears, in equal installments of one-half of the monthly amount due by the Company, twice per month, on the first business day of the month (with respect to the period ending on the last day of the previous month) and on the first business

1



day after the fifteenth of the month (with respect to the period ending on the fifteenth of the month).

(b)  Equity. As additional compensation, the Company agrees to issue Consultant restricted preferred stock and restricted common stock in the Company on the terms and conditions of an award agreement to be entered into between Consultant and the Company (an "Award Agreement") issued pursuant to an equity incentive plan to be adopted by the Company.  The Award Agreement shall be subject to the terms and conditions of such equity incentive plan. The Award Agreement will provide for Consultant to receive seven thousand five hundred (7,500) shares of the Company's common stock, of which two thousand five hundred (2,500) shares will be preferred stock with fifty times (50x) voting rights, and five thousand shares (5,000) will be common stock.  The shares will be distributed over a four (4) year vesting schedule, every six (6) months.  The foregoing gives the Consultant roughly seven and one half percent (7.5%) based on Teague Egan, the founder of the Company, and/or his controlled entities, holding approximately One Hundred Thousand (100,000) shares of issued and outstanding shares of common stock on a fully diluted and as converted basis prior to the issuance of the restricted common stock to Consultant, it being agreed that the number of shares of restricted common stock to be issued to Consultant pursuant to the Award Agreement shall be proportionately adjusted if Teague Egan and/or his controlled entities are issued a higher or lower multiple of such number of shares.  Notwithstanding anything to the contrary, following the consulting period, the Company and Consultant will have the mutual option to execute and deliver an Employment Agreement (as defined below).

For purposes hereof, the term "Employment Agreement" means a written employment agreement between the Company and Consultant, in form and substance satisfactory to the parties, providing for the employment of Consultant on a full time basis for a base salary of Two Hundred Thousand Dollars ($200,000) per year and benefits generally offered to other employees of the Company. The Employment Agreement shall include customary confidentiality, inventions assignment, non-solicitation and non-competition covenants or, if requested by the Company, Consultant shall execute and deliver a separate agreement containing such covenants.

(c)  No Benefits.  Unless and until an Employment Agreement is entered into by the parties, Consultant shall not be entitled to any benefits provided by the Company to its employees, including, without limitation, health insurance, hospitalization, workers compensation insurance, liability or pension plan coverage and other fringe benefits.

4.  Expenses.  Expenses incurred or paid by Consultant during the Term in connection with the performance of Services shall be paid or reimbursed by the Company only if such expenses have been approved in advance by the Company, which approval may be in the form of an email or text, and Consultant has submitted all expense statements or vouchers or such other supporting information as the Company may reasonably require.  Except for the foregoing, all expenses incurred by Consultant or its employees in connection with the performance of the Services and its duties under this Agreement shall be borne wholly and completely by Consultant.



5.    Independent Contractor. The parties hereto acknowledge and agree that Consultant shall act only as an independent contractor under this Agreement and that neither any act by Consultant or the Company nor anything contained in this Agreement shall be deemed or construed (a) to create a partnership or joint venture between the Company and Consultant or (b) to constitute Consultant as an employee of the Company. Consultant shall include all compensation it receives hereunder in its own books or account for inclusion on its own applicable tax return, and Consultant shall be solely responsible for any and all taxes imposed thereon. Consultant agrees that such compensation will not be subject to any employee payroll taxes or similar deduction, and agrees to indemnify and hold the Company harmless from any liability incurred by the Company for its failure to withhold taxes on compensation paid to Consultant.

6.    Term. The initial term of this Agreement shall commence on April 15, 2019, and shall terminate at the sooner of either (a) the graduation of Consultant from the chemical engineering graduate program at the University, or (b) two (2) years thereafter, unless sooner terminated in accordance with Section 7 (the "Term"); provided that if Consultant with the approval of the Company continues to provide Services after the Term, the terms and conditions of this Agreement shall apply to such continued Services.

7.    Termination. Notwithstanding anything to the contrary, this Agreement may be terminated (a) by either party, without cause, upon not less than thirty (30) business days prior written notice to the other party, and (b) at any time by a party immediately upon written notice to the other party if the other party is in breach or default of any material obligations contained herein which breach or default is not cured within two (2) weeks after written notice from the terminating party. Upon termination of this Agreement, Consultant shall be entitled to receive accrued but unpaid amounts due by the Company under Section 3(a) and Section 4 through the date of termination of this Agreement. Except for the foregoing, Consultant shall receive no other payments following termination of this Agreement.

8.    Confidential Information.

(a)    Definition. "Confidential Information" means trade secrets and other confidential or proprietary information of the Company, including, but not limited to, all of the Company's plans for creation, acquisition or disposition of products, publications and websites, expansion plans, financial status and plans, products, improvements, formulas, designs or styles, method of distribution, customer lists, product development plans, rules and regulations, personnel information and trade secrets of the Company, all of which are of vital importance to the success of

(b)    Protection and Marking. Consultant agrees that that all Confidential Information that Consultant has access to or acquires knowledge of: (i) is to be held in strict confidence by Consultant, (ii) is to be used by and under authority of the Company only as authorized in this Agreement, and (iii) shall not be disclosed by Consultant without the prior written consent of the Company or as authorized in this Agreement. Consultant's obligation of confidence hereunder includes, without limitation, using at least the same degree of care with the Company's Confidential Information as it uses to protect its own confidential information, but always at least a reasonable degree of care.

3



(c)    <u>Confidentiality of Terms of this Agreement</u>.  Consultant agrees not to disclose to any third party the terms of this Agreement without the prior written consent of the Company, except Consultant may disclose the terms of this Agreement: (a) to advisors and others on a need to know basis, in each case, under appropriate confidentiality obligations substantially similar to those of this Section 8; (b) to the University, and (c) to the extent necessary to comply with applicable laws and court orders (including, without limitation, The Texas Public Information Act, as may be amended from time to time, other open records laws, decisions and rulings, and securities laws, regulations and guidance). Notwithstanding the foregoing, the existence of the Agreement shall not be considered Confidential Information.

(d)    <u>Disclosure Required by Court Order or Law</u>. If Consultant is required to disclose Confidential Information of the Company, or any terms of this Agreement, pursuant to the order or requirement of a court, administrative agency, or other governmental body or applicable law, Consultant may disclose such Confidential Information or terms to the extent required, provided that Consultant shall use reasonable efforts to provide the Company with reasonable advance notice thereof to enable the Company to seek a protective order and otherwise seek to prevent such disclosure. To the extent that Confidential Information so disclosed does not become part of the public domain by virtue of such disclosure, it shall remain Confidential Information protected pursuant to Section 8.

(e)    <u>Copies</u>.  Consultant agrees not to copy or record any of the Confidential Information of the Company, except as reasonably necessary to exercise its rights or perform its obligations under the Agreement, and for archival and legal purposes.

(f)    <u>Continuing Obligations</u>.  Subject to the exclusions listed in Section 8(g), Consultant's confidentiality obligations under this Agreement will survive termination of the Agreement and will continue for a period of five years thereafter.

(g)    <u>Exclusions</u>.  Information shall not be considered Confidential Information of the Company under this Agreement to the extent that Consultant can establish by competent written proof that such information:

(i)    Was in the public domain at the time of disclosure; or

(ii)    Later became part of the public domain through no act or omission of Consultant in breach of the Agreement; or

(iii)    Was lawfully disclosed to Consultant by a third party (including the University) having the right to disclose it not under an obligation of confidentiality; or

(iv)    Was already known by Consultant at the time of disclosure; or

(v)    Was independently developed by Consultant without use of the Company's Confidential Information.

(h)    <u>Copyright Notice</u>.  The placement of a copyright notice on any Confidential Information will not be construed to mean that such information has been published and will not release Consultant from its obligation of confidentiality hereunder.

4

9.    Non-Competition.  Consultant agrees that during the Term and for a period of one (1) year after the Term, Consultant will not directly or indirectly, (x) engage in any business for Consultant's own account that would render Consultant a Direct Competitor (as defined below), (y) enter the employ of, render any services to, acquire a financial interest in, or otherwise become actively involved with, a Direct Competitor, or (z) interfere with business relationships (whether formed before or after the date of this Agreement) between the Company and customers or suppliers of, or consultants to, the Company that were engaged in, or were immediate prospects for engaging in, business with the Company before Consultant's engagement by the Company was terminated.  For purposes of this paragraph, the Company shall be construed to include the Company and its subsidiaries and affiliates.  For purposes of this paragraph, "Business" shall mean the design, innovation, manufacture and sale of lithium and/or desalination technology.  For purposes of this paragraph, "Direct Competitor" shall mean any person or entity that engages in the Business, including, but not limited to, SQM, Albemare and Lithium Americas. For the avoidance of doubt, Consultant may work for a Direct Competitor in a different division or subsidiary so long as he does not provide services for the division or subsidiary engaged in the Business.

10.    Non-Solicitation.  During the Term and for a period of one (1) year after the Term, Consultant will not, directly or indirectly, solicit or encourage to cease to work with the Company, any person or entity that is a client, customer, supplier or contractor of the Company or who was a client, customer, supplier, contractor the Company within the twelve (12) month period preceding the termination of Consultant's engagement, without the Company's written consent.

11.    Work Product.  [Consultant agrees that any and all of Consultant's discoveries, ideas, inventions, concepts, developments, know-how, trade secrets, works of authorship, materials, writings, drawings, designs, processes, techniques, formulas, data, specifications, technology, patent applications (and contributions thereto), and other creations that are conceived, created or otherwise developed by Consultant pursuant to this Agreement ("Work Product") shall be considered "work made for hire" (as such term is defined in 17 U.S.C. §101) and shall be the sole and exclusive property and Confidential Information of the Company.  To the extent that the Work Product may not be considered "work made for hire," Consultant shall irrevocably assign to the Company all right, title and interest worldwide in and to the Work Product (whether currently existing or conceived, created or otherwise developed later), including, without limitation, all copyrights, trademarks, trade secrets, patents, industrial rights and all other intellectual and proprietary rights related thereto.][1]

12.    Non-Disparagement.  Each party agrees that he or it will not at any time, directly or indirectly, on his or its own behalf or in the service of or on behalf of others, publish, circulate, utter or disseminate, or cause to be published, circulated, uttered or disseminated, in any manner or by any means whatsoever, to any person or entity, any statements, comments or material whatsoever, which could or would, in any manner whatsoever, either reflect unfavorably upon the reputation of the other party, or harm, damage or impair the business or operations of the other party.

---

[1] Discuss in the context of TJ's dual role and the University's rights in IP.

13.    <u>Remedies</u>.  Consultant acknowledges that any breach of Sections 8 through 12 of this Agreement (the "<u>Restrictive Covenants</u>") by Consultant will cause the Company irreparable harm for which there is no adequate legal remedy, and agrees that in the event of any actual or threatened breach of any Restrictive Covenant, the Company shall be entitled to temporary and permanent injunctive relief and all other appropriate equitable relief (including a decree of specific performance), without being required to (i) show any actual damage or irreparable harm, (ii) prove the inadequacy of its legal remedies, or (iii) post any bond or other security. Consultant further agrees that in the event a bond or other undertaking is required of the Company in connection with the issuance of a temporary injunction enjoining Consultant from acts claimed by the Company to violate any Restrictive Covenant, such bond or other undertaking shall not exceed One Thousand Dollars ($1,000).  The foregoing remedies of the Company may be exercised without prejudice to (and are cumulative with) the Company's other available rights and remedies at law, in equity, or under this Agreement, including the Company's right to monetary damages arising from any breach of this Agreement by Consultant.  Consultant will notify the Company in writing immediately upon Consultant becoming aware of any such breach or threatened breach.

14.    <u>Use of Name and Likeness</u>.  Consultant irrevocably consents to the Company's use and display of Consultant's name, likeness, voice, image and biographical information for lawful marking and other business purposes of the Company without the consent of, or payment of additional compensation to, Consultant during the Term of this Agreement.

15.    <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed to have been given five (5) business days after having been mailed, certified mail (return receipt requested and postage-prepaid), when sent by email with customary confirmation of receipt during business hours on a business day (or if sent after business hours on the next business day), or one (1) business day after being sent by a nationally recognized overnight delivery service, addressed to the party to which such notice is directed at its address set forth in this Agreement.

16.    <u>Governing Law and Venue</u>.  This Agreement shall be governed by and construed pursuant to the internal laws of the Commonwealth of Puerto Rico without regard to its principles of conflicts of law.  Any dispute arising out of or relating to this Agreement shall be brought only in the courts of record of the Commonwealth of Puerto Rico or the court of the United States for the District of Puerto Rico, and each party consents to and confers personal jurisdiction on such courts.

17.    <u>JURY TRIAL WAIVER</u>.    THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT.

18.    <u>Miscellaneous</u>.

(a)    Except with the Company's prior written consent, Consultant shall not take any action to bind the Company in any way with any third party,.



(b)    The terms and conditions of Sections 7 through 18 shall survive the expiration or termination of this Agreement.

(c)    If any term or provision of this Agreement is invalid, illegal, or unenforceable, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement.

(d)    The parties hereby agree from time to time to execute and deliver such further and other documents and agreements and do all matters and things which may be convenient or necessary to more effectively and completely carry out the intention of this Agreement.

(e)    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same legal instrument.  This Agreement may be executed by "pdf" or facsimile.

(f)    This Agreement constitutes the entire agreement between the parties and shall supersede all other oral or written agreements between the parties, respecting the subject matter of this Agreement.  This Agreement may only be modified or amended by written instrument executed by both parties.

[SIGNATURE PAGE FOLLOWS]

7



IN WITNESS WHEREOF, each of the parties hereto has duly executed this Agreement as of the date set forth above.

Company:                                    Consultant:

ENERGY EXPLORATION
TECHNOLOGIES, INC.

By:_____              *Theodore J. Dilenschneider*
        Teague Egan                         THEODORE DILENSCHNEIDER
        Chief Executive Officer

Address for Notices:                        Address for Notices:

Energy Exploration Technologies, Inc.        Theodore J. Dilenschneider
1500 Cordova Road                            ~~436 Balch Road~~
Suite 302                                    Elgin, TX 78621
Fort Lauderdale, FL 33316                    TEL: 614-519-9977
Attn:   Teague Egan
Tel:    (954) 854-0696                       Email: tjdilen@gmail.com
Email: Teague@innovationfactory.vc

8

**EXHIBIT A**

**SERVICES**

Consultant shall serve as the Company's Chief Scientific Officer, and shall manage the operational and financial  actions of the Company, including but not limited to:

1. Research and development
2. Scalable casting and system integration for mixed matrix membrane
3. Scientific aspects of manufacturing and supply chain
4. Managing interrelated scientific aspects with manufacturing partnerships and relationships associated therewith
5. Fielding any scientific questions of customers, clients, and partners
6. Working with CFO on scientific aspect of financial projections, planning, structuring.
7. Working with CEO on overall general coordination of logistics and operations for Company
8. Assistance with administrative functions in association with the Chief Executive Officer

Exhibit A